**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **RICHARD TORGERSON, ROBERT** | ) | |
| **HALL, SHELLEY GORDON,** | ) | |
| **BRYON HUGHES, AND MOSES** | ) | |
| **BOYE-DOE, on Behalf of Themselves,** | ) | |
| **And All Others Similarly Situated,** | ) | **Case No. 16-02495-DDC-TJJ** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LCC INTERNATIONAL, INC., et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO VACATE CLASS DETERMINATION AWARD

### I.   INTRODUCTION

Arbitration is a matter of consent, not coercion. And, parties cannot be forced to engage in class, collective, or group arbitration absent a "contractual basis" for concluding the parties "agreed to do so." *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l, Corp.*, 559 U.S. 662, 687 (2010). On April 24, 2019, the United States Supreme Court definitively ruled that an arbitration agreement stating that "***any and all disputes, claims or controversies arising out of or relating to [] the employment relationship between the parties [] shall be resolved by final and binding arbitration***" does not embody the consent necessary to establish an agreement to arbitrate group claims. *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416-19 (2019). That is, general "any and all dispute" language does ***not***–and cannot–authorize aggregation.

But all this fell on deaf ears in the arbitration which underlies this action. Specifically, on July 8, 2019 in an arbitration styled *Richard Torgerson, et al v. LCC Int'l, Inc.*, AAA No. 01-17-

0000-3776, Arbitrator David Ball ruled that *Lamps Plus* had "no bearing on this case" because the arbitration provision in Mr. Torgerson's Employment Agreement on Ideas, Inventions and Confidential Information ("Arbitration Agreement") was unambiguous and authorized collective arbitration. But Mr. Torgerson's Arbitration Agreement is virtually identical to Mr. Varela's, reading: "***[a]ny controversy or claim arising out of or relating to*** . . . . ***Employee's employment with LCC shall be settled by arbitration***." It defies logic that the broad, boilerplate language which the Supreme Court deemed insufficient to manifest the requisite consent to class arbitration in *Lamps Plus* is sufficient in this case, particularly where the Arbitrator relied on nothing other than the contractual language itself in rendering his Class Determination Award.

This Court must now vacate the Arbitrator's Class Determination Award. As a threshold matter, this Court, and not the Arbitrator, must decide the issue of class arbitrability. The parties never agreed to delegate the issue to the Arbitrator. Indeed, both argued the issue was for the Court to resolve, belying any assertion the parties agreed to delegate the issue by referencing the rules of the American Arbitration Association ("AAA"). Although the Court ruled differently for reasons explained below, that referral was error. Regardless, the Arbitrator's ruling exceeded his authority and constitutes manifest disregard for the law. One simply cannot square the Arbitrator's Class Determination Award with *Lamps Plus*. Indeed, *Lamps Plus* bars the Arbitrator's conclusion. As such, the Arbitrator's ruling lacks any contractual basis, exceeds his authority, and constitutes willful inattentiveness to controlling law. This Court must vacate the Class Determination Award and order Mr. Torgerson to arbitrate his FLSA claim on an individual basis.

## II.   <u>RELEVANT FACTUAL BACKGROUND</u>

LCC provides telecom services to wireless operators worldwide. Mr. Torgerson is a former Migration Analyst and Senior Migration Analyst who worked for LCC from February 2013 until

April 2017. Mr. Torgerson claims that LCC misclassified the Migration Analyst position as exempt from the FLSA's overtime provisions, and that LCC therefore owes him, and all other similarly situated employees, overtime pay in those weeks in which they can prove they worked more than 40 hours. **Ex. 1**, Federal Court Complaint. According to Mr. Torgerson, all Migration Analysts are similarly situated because they allegedly performed the same job duties, routinely worked over 40 hours per week, and did not receive overtime pay. *Id.* at ¶¶ 18-24; 31. As a result, he seeks to pursue his FLSA misclassification claim on a collective basis. *Cf.* 29 U.S.C. §216(b) (authorizing employees to sue for FLSA violation on behalf of themselves and others "similarly situated").

As a condition of employment with LCC, Mr. Torgerson signed an Employee Agreement. *See* **Ex. 2**, Mr. Torgerson's Employee Agreement. The Employee Agreement is a contract expressly "made and entered into . . . by and between LCC" and the individual employee who signs it. (*Id.*, 1). The Employee Agreement references and defines "the 'Employee'" as the undersigned employee, meaning the single individual who executes the Agreement. (*See Id.*, 1). The Employee Agreement contains several provisions related to the Employee's individual employment with LCC. It also contains an Arbitration Agreement.  In relevant part, it states

> ***[a]ny controversy or claim arising out of or relating to*** this Agreement, the breach or interpretation thereof ***or Employee's employment with LCC*** shall be settled by arbitration in Arlington, Virginia in accordance with the then prevailing rules of the American Arbitration Association, and judgment upon the award shall be final, conclusive and binding.

*Id.*, § 5.4 (emphasis added). Significantly, the Arbitration Agreement does not authorize arbitration on a class, multi-plaintiff, or multi-claimant basis. Both parties agree it is silent on this point. Indeed, Mr. Torgerson has previously admitted the Arbitration Agreement "makes no express reference to collective arbitration" **Ex. 3**, Claimant's Response Brief in Opposition to

Respondent's Motion for Clause Construction Award, pg. 15. He has further admitted the Agreement "lack[s] [] an express reference to a collective in the agreement." *Id.* at 10.

## III.   PROCEDURAL HISTORY

### A.   This Court Compels The Parties To Arbitrate Because It Finds They Delegated The Question Of Class Arbitrability To The Arbitrator.

On August 10, 2016, this Court stayed this case and compelled the parties to arbitrate Mr. Torgerson's FLSA claim. Dkt. 62, pg. 3-6.[1] In so ruling, the Court held the parties had clearly and unmistakably delegated questions of arbitrability to the Arbitrator because the Arbitration Agreement "incorporated" the AAA Rules.[2] *Id.* at pg. 6-8. Thus, the Court denied the parties' request that it–and not the arbitrator–should decide whether the Arbitration Agreement authorizes collective arbitration (*i.e.*, arbitrability). *Id.*

### B.   The Arbitrator Finds The Arbitration Agreement Authorizes Collective Arbitration.[3]

On January 17, 2017, Mr. Torgerson filed a Demand for Collective Arbitration with the AAA. **Ex. 4**, Demand for Arbitration.[4] On June 2, 2017, LCC filed a Motion for Initial Clause

---

[1] Before the Court compelled the parties to arbitrate Mr. Torgerson's FLSA claim, 18 former LCC employees filed consent forms in federal court seeking to join the collective action. By the time Mr. Torgerson filed his Demand for Collective Arbitration, 22 former LCC employees had filed consent forms in federal district court: Mr. Torgerson, the four other named plaintiffs in the federal lawsuit, and 17 additional LCC employees. Another individual filed a consent form after Mr. Torgerson submitted his Demand for Collective Arbitration. Thus, before Mr. Torgerson filed a Motion for Conditional Certification in arbitration, 23 individuals had filed consent forms to join the collective arbitration.

[2] The Arbitration Agreement states that any arbitration shall proceed "in accordance with the then prevailing rules of [the AAA]." The Court previously labeled this an "incorporation" of the AAA Rules. Whether the Arbitration Agreement's reference to an arbitration proceeding being conducted "in accordance with the rules of [the AAA]" in fact amounts to "incorporation" of those rules is a question this Court did not answer. LCC contends it is not.

[3] This Court summarized the procedural history of the federal court litigation of this case in its January 25, 2018 Memorandum and Order in *LCC Int'l, Inc. v. Torgerson*, No. 17-2508-DDC-TJJ, 2018 WL 558141 (D. Kan. Jan. 25, 2018).

[4] Mr. Torgerson submitted his claim on a putative collective basis, and the AAA processed his claim accordingly. **Ex. 5**, Letter from AAA to J. Boudreau and Gregory Goheen, Jan. 23. 2017. LCC, however, contended that it was not required to pay the AAA's fee schedule for class and collective actions because the arbitration provision at issue did not authorize the filing of such group claims. **Ex. 6**, Email from J. Boudreau to AAA Employment Filing Team, Feb. 13, 2017.

Construction Award. **Ex. 7**. Among other things, LCC argued: (1) the Arbitration Agreement's silence regarding class, collective, or group arbitration bars such proceedings in arbitration; and (2) any finding that the Arbitration Agreement authorizes collective proceedings would conflict with its plain language, LCC's understanding of its terms, and the historical application of the Agreement. *Id.*

On June 30, 2017 the Arbitrator issued an initial Clause Construction Award. **Ex. 8**, Clause Construction Award. The Arbitrator ruled that the Arbitration Agreement authorized collective arbitrations. *Id.* at 10-12. Although the Arbitrator acknowledged that the parties agreed the arbitration provision did not explicitly reference or authorize group actions, he inferred such an agreement despite the parties' silence on the issue. *Id.* Specifically, he stated the Arbitration Agreement's "words themselves" unambiguously authorize collective action. *Id.* at 12. According to the Arbitrator, the Agreement's broad reference to "[a]ny controversy or claim arising out of or relating to . . . . Employee's employment with LCC" (describing the Arbitration Agreement's scope), coupled with Virginia contract interpretation principles which state that courts may not look beyond the words of unambiguous contracts, permit the "Agreement's arbitration provisions [to] be interpreted to authorize collective action."[5] *Id.* at 10-12 (citing *Robinson-Huntley v. George Washington Carver Mut. Homes Ass'n, Inc.*, 287 Va. 425, 429 (Va. 2014)).

### C.  This Court Denies LCC's Petition to Vacate.

In response to the Arbitrator's initial Clause Construction Award, LCC filed a Petition to Vacate ("Petition"). **Ex. 9**, Petition to Vacate.[6] LCC argued the Arbitrator exceeded his authority

---

[5] Considering all agree the Arbitration Agreement is silent as to the availability of class arbitration, the Arbitrator's conclusion that the Arbitration Agreement is "unambiguous" in that regard is specious. And consequently, his citation to Virginia law for the proposition that one may not look beyond the terms of an unambiguous contract is inapt.

[6] LCC initially filed the Petition in the United States District Court for the Eastern District of Virginia. After the parties entered a Joint Stipulation to transfer LCC's Petition to the District of Kansas, the Eastern District of Virginia transferred the action to this Court. *LCC*, 2018 WL 558141, at *3.

in concluding that the Arbitration Agreement authorized collective arbitration because both parties agreed that it was silent on the issue. *Id.* This Court disagreed, concluding the Arbitrator did not exceed his authority because he did what the parties authorized him to do: interpret the Arbitration Agreement. *LCC*, 2018 WL 558141 at *10-11. Because the Arbitrator's ruling was based on an interpretation of the Arbitration Agreement, the Court held it could not vacate the decision, "however good, bad, or ugly." *Id.* at *11.

### D. Discovery In Arbitration.

After the parties conducted limited discovery, on March 6, 2018, Mr. Torgerson filed a motion asking the Arbitrator to authorize him to send notice of the arbitration to putative claimants. The Arbitrator granted the motion and Mr. Torgerson sent notice of the arbitration to current and former LCC Migration Analysts and Senior Migration Analysts. In response, thirteen (13) former LCC employees filed consent-to-sue forms with the AAA joining the arbitration. By June 1, 2018, 36 former LCC employees, including Mr. Torgerson, had joined the collective arbitration. Twenty-nine (29) claimants presently remain.[7]

### E. The Arbitrator Issues His Class Determination Award and Holds *Lamps Plus* Does Not Apply.

On May 1, 2019, in accordance with AAA Rules, LCC moved to decertify the collective arbitration. LCC argued, among other things, that *Lamps Plus* mandates decertification because the plain words of Mr. Torgerson's Arbitration Agreement (which are virtually identical to the arbitration agreement in *Lamps Plus*) lack any "contractual basis" to establish the parties' consent to collective arbitration. **Ex. 10**, Motion to Decertify and Relevant Portions of Memorandum of Law In Support of Motion to Decertify. Mr. Torgerson responded that *Lamps Plus* was inapposite.

---

[7] On January 18, 2019, the Arbitrator dismissed five opt-in claimants with prejudice on statute of limitations grounds. **Ex. 11**, Jan. 18, 2019 Order. He dismissed two more opt-in claimants without prejudice. *Id.*

In his view, *Lamps Plus'* holding applies only to ambiguous agreements, not arbitration agreements that purportedly authorize collective arbitration based on an interpretation of its terms. **Ex. 12**, Relevant portion of Opposition to Motion for Decertification.

On July 8, 2019, the Arbitrator issued his Class Determination Award. **Ex. 13**. He concluded *Lamps Plus* did not mandate decertification because: (1) "*[Lamps Plus's]* holding was *explicitly* limited to the question of whether 'an ambiguous agreement can provide the necessary contractual basis for compelling arbitration'"; and (2) the Arbitrator previously ruled that the "arbitration may proceed on a collective basis based on [its] unambiguous, express words . . .."[8] As such, according to the Arbitrator "*[Lamps Plus]* . . . . has no bearing on whether this matter may proceed on a collective basis." *Id.* at pg. 1.

## IV.   WHETHER THE ARBITRATION AGREEMENT AUTHORIZES CLASS ARBITRATION IS A GATEWAY QUESTION FOR THE COURT AND THIS COURT ERRED WHEN IT DELEGATED THAT QUESTION TO THE ARBITRATOR.

As a threshold matter, LCC submits it was error for this Court not to decide the class arbitrability question itself. Over the objection of all parties, this Court previously referred that issue to the Arbitrator, citing *Hedrick v. BNC Nat'l Bank*, 186 F. Supp. 3d 1189, 1196 (D. Kan. 2016) (holding arbitration agreement's incorporation of AAA Rules constitutes "clear and unmistakable evidence" that parties agreed to delegate gateway issue of classwide arbitrability to arbitrator); *see also Dish Network LLC v. Ray*, 900 F.3d 1240 (10th Cir. 2018). But LCC submits that *Hedrick* and *Dish Network* are not dispositive here.

---

[8] The Arbitrator states in passing that LCC agrees the Arbitration Agreement is unambiguous. This is misleading (and perhaps intentionally so). Since this litigation began, LCC has repeatedly and consistently asserted the Arbitration Agreement is unambiguous regarding the fact that it does not explicitly permit class, collective or group arbitration. *See* **Ex. 7**, Memorandum of Law in Support of Motion for Clause Construction Award, pg. 9.

To start, LCC submits that *Dish Network* is wrongly decided. Although LCC understands the decision binds this Court, it bears noting that multiple circuit courts have ruled to the contrary, holding that merely incorporating or referencing the AAA Rules in an arbitration agreement is not sufficiently "clear and unmistakable evidence" of an intent to delegate such gateway issues to an arbitrator (and the Supreme Court, to date, has expressly disclaimed deciding the issue). *Compare 20/20 Communications, Inc. v. Crawford*, No. 18-10260, 2019 WL 3281412, at *2 (5th Cir. July 22, 2019) (holding class arbitrability gateway issue for court, not arbitrator, to decide), *Catamaran Corp. v. Towncrest Pharmacy*, 864 F.3d 966, 972 (8th Cir. 2017); *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 762–63 (3d Cir. 2016); *Dell Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 876–77 (4th Cir. 2015); *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599–600 (6th Cir. 2013) *with Lamps Plus*, 139 S. Ct. at 1417 n.4; *Dish Network*, 900 F.3d at 1245.

Correctly decided or not, though, *Dish Network* is distinguishable. Indeed, there is one point all parties agree on here that was not extant in *Dish Network*: all parties previously argued that whether the Arbitration Agreement authorizes collective arbitration is an issue that "belongs to the court." Dkt. 62, pg. 6. Also manifesting the parties' intent, neither invoked the delegation provision of the AAA Rules. Rule 6(a), AAA Employment Arbitration Rules and Mediation Procedures (available at www.adr.org) (last visited August 6, 2019). Rather, the Court enforced it *sua sponte*. Considering that the parties were aligned on the salient point, it defies logic to contend that the Arbitration Agreement's reference to the AAA Rules is "clear and unmistakable" evidence of a contrary intent, *i.e.*, to delegate questions of class arbitrability to an arbitrator. Had the parties

intended the incorporation of the AAA Rules to manifest an assent to delegation of gateway issues, the parties would not have aligned and argued the issue was for the Court.[9]

Further distinguishing *Dish Network* is that the Tenth Circuit based its conclusion in part on Colorado law (the law governing the agreement), which itself holds that incorporating AAA Rules into an arbitration agreement authorizes the arbitrator to decide class arbitrability. *Id.* at 1246 (citing *Ahluwalia v. QFA Royalties, L.L.C.*, 226 P.3d 1093, 1099 (Colo. App. 2009)). Here, however, Virginia law applies. **Ex. 2**, § 5.4. Unlike Colorado law, no Virginia court has explicitly held that incorporation of the AAA Rules constitutes "clear and unmistakable evidence" that the parties intended to delegate the question of class arbitrability to the arbitrator.

## V.   THIS COURT MUST VACATE THE ARBITRATOR'S CLASS DETERMINATION AWARD BECAUSE HE EXCEEDED HIS AUTHORITY COMMITTING PLAIN ERROR.

Under the FAA, a district court may vacate an arbitral award upon application of any party to the arbitration "where the arbitrator[] exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Although the standard of review for a petition or motion to vacate an arbitration award is narrow, *Dominion Video Satellite, Inc. v. Echostar Satellite, LLC*, 430 F.3d 1269, 1275 (10th Cir. 2005), "courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators." *Sonic Auto., Inc. v. Price*, No. 3:10-CV-382, 2011 WL 3564884, at *11 (W.D.N.C. Aug. 12, 2011) (quoting *Matteson v. Ryder–System, Inc.*, 99 F.3d 108, 113 (3d Cir.

---

[9] It bears noting that the Supreme Court in *Oxford Health Plans, LLC v. Sutter* did not address whether the availability of class arbitration is a gateway question of arbitrability for the court, *i.e.*, a gateway issue, because in *Oxford Health*, unlike here, the parties "agreed that the arbitrator should determine whether its contract with Sutter authorized class procedures." 569 U.S. 564, 569 n. 2. In fact, had Oxford Health argued the question of class arbitrability was a gateway issue for the court, that ruling would have been subject to *de novo* review. That is, the Court would have had to determine for itself whether there was "clear and unmistakable" evidence that the parties intended an arbitrator to resolve such gateway disputes. *Id.*

9

1996)). In *Stolt-Nielsen,* the Supreme Court explained that a court may vacate an arbitrator's award under § 10(a)(4) where "an arbitrator strays from interpretation and application of the agreement [of the parties] and effectively dispenses his own brand of industrial justice." 559 U.S. at 671. This case presents such a scenario.

### A. The Arbitrator Exceeded His Powers By Finding The Arbitration Agreement's Express Words Contained the Contractual Basis Necessary to Authorize Collective Arbitration.

"[A]rbitration is strictly a matter of consent." *Granite Rock Co. v. Teamsters*, 561 U.S. 287 (2010). "Consent is essential under the FAA because [an] arbitrator[] wield[s] only the authority" the parties give him. *Lamps Plus*, 139 S. Ct. at 1416. An arbitrator's task is to give effect to the intent of the contracting parties, not to impose his own preference on them. *Stolt-Nielsen*, 559 U.S. at 672. The FAA only permits an inference of consent to collective treatment when "there is a contractual basis for concluding that the parties agreed to do so." *Id.* at 684, 687.

In *Lamps Plus*, the Supreme Court examined what "contractual basis" will suffice. There, the plaintiff's arbitration agreement required him to arbitrate "any and all disputes, claims or controversies arising out of or relating to [] the employment relationship." *Lamps Plus*, 139 S. Ct. at 1427 (Kagan, J. dissenting). The Court found that this general language–commonly used in bilateral arbitration agreements–does not provide the affirmative contractual basis to conclude the parties agreed to class, collective, or group arbitration. *Id.* at 1416-19. Stated differently, the "FAA requires more" than "silence []or ambiguity" to establish the parties' agreed to depart from bilateral arbitration. *Id.* at 1417 (citing *Stolt-Nielsen.*, 559 U.S. at 687).

Here, Mr. Torgerson's Arbitration Agreement requires him to arbitrate "[a]ny controversy or claim arising out of or relating to . . . . Employee's employment with LCC." The parties agree the Arbitration Agreement is silent on group arbitration. It simply does not contemplate it. And

10

the Arbitrator acknowledged that the parties agree on this point. **Ex. 8**, Clause Construction Award, at pg. 10. Hence, after *Lamps Plus*, the meaning of the parties' Arbitration Agreement was no longer in dispute: the broad reference to "[a]ny controversy or claim" in the Arbitration Agreement could not, and cannot, establish an affirmative contractual basis that the parties agreed to collective arbitration. Despite this, the Arbitrator ruled the Arbitration Agreement was "unambiguous," its "express words" authorizing collective arbitration. **Ex. 13.**

In holding that the Arbitration Agreement's terms were "unambiguous" and authorized collective arbitration, the Arbitrator did precisely what the Supreme Court ruled the arbitrator in *Stolt-Nielsen* erroneously did: he issued an award that "simply reflect[s] [his] own notions of [economic] justice" rather than "draw[ing] its essence from the contract." *Oxford Health Plans, LLC v. Sutter*, 569 U.S. 564, 569 (2013) (internal citations omitted). The Arbitrator's decision "was not–indeed, could not have been–'based on a determination regarding the parties' intent'" *id.* (quoting *Stolt-Nielsen*, 559 U.S. at 673 n.4) because the Supreme Court in *Lamps Plus* ruled virtually identical, broad language did not provide the requisite affirmative contractual basis to conclude the parties agreed to collective arbitration. That is, *Lamps Plus* "left no room" (*Stolt-Nielsen*, 559 U.S. at 676) for an inquiry regarding the parties' intent based on the Arbitration Agreement's broad "any and all" disputes language. Yet that is precisely what the Arbitrator did.

Because *Lamps Plus* forecloses the ability of a court or arbitrator to rely on broad language in an arbitration agreement as the contractual basis for establishing the requisite consent to class, collective, or group arbitration (what the Arbitrator did here), the Arbitrator had two options: (1) cite different contractual provision(s) to establish the parties in fact agreed to collective arbitration; or (2) identify record facts which show the parties agreed to collective arbitration. He did neither.

Accordingly, because the Arbitration Agreement's terms do *not* support the Arbitrator's Class Determination Award, his award is best understood as an attempt to rationalize a preference for aggregation. The FAA, however, forbids the assertion of arbitral power to impose class procedures based on an arbitrator's view such procedures should be available as a policy matter. *Stolt-Nielsen*, 559 U.S. at 671-76. And, that is what the Arbitrator did in this case.

**B.   *Oxford Health* Does Not Insulate The Class Determination Award From Vacatur.**

Section 10(a)(4) of the FAA allows a district court to vacate an arbitrator's award "only when the arbitrator strayed from his delegated task of interpreting a contract, not when he performed that task poorly." *Oxford Health*, 569 U.S. at 572. In *Oxford Health*, the parties disagreed regarding the interpretation of their agreement and thus specifically asked the arbitrator to decide whether the arbitration agreement at issue authorized class proceedings. *Id.* at 570. The arbitrator interpreted the arbitration clause to "glean the parties' intent" and found that the "arbitration clause unambiguously evinced an intention to allow class arbitration." *Id.* at 567-68. Specifically, he found that the "the text of the clause itself authorizes class arbitration." *Id.* at 570. Oxford Health petitioned the court to vacate the award, arguing the arbitrator exceeded his authority because he did not have a "sufficient" contractual basis to conclude the parties' consented to class arbitration. *Id.* at 571. That was not enough to vacate the award, though, because the arbitrator did what the parties' asked: he interpreted the agreement. *Id.*

This case stands in stark contrast to *Oxford Health*. As an initial matter, unlike in *Oxford Health*, the parties here never agreed the arbitrator should resolve whether the Arbitration Agreement authorizes class procedures. *Id.* at 569, n. 2. Indeed, as explained above, both parties believed this question "belongs to the court." Dkt. 62, pg. 7. The Court, however, demurred,

delegating that issue to the arbitrator. *Id.* at pg. 6-9. So, unlike *Oxford Health*, the Arbitrator here resolved an issue that neither party wanted him to resolve.

Second, in *Oxford Health*, the respondent argued the arbitrator did not have a "sufficient" contractual basis to conclude the parties' consented to class arbitration because he interpreted the agreement incorrectly. *Id.* at 571. Here though, the Arbitrator lacked *any contractual basis* for ordering collective arbitration. This is so because the language this Arbitrator held authorized collective arbitration is *precisely* the language that *Lamps Plus* ruled did not and could not establish a contractual basis to conclude the parties' consented to group arbitration. Notably, the Arbitrator did not try to distinguish the words of the Arbitration Agreement from the words of the agreement at issue in *Lamps Plus* in an effort to establish the former was unambiguous but the latter was not. He simply declared it to be so. Nor did he rely on other provisions of the Employee Agreement or any record evidence to support his conclusion that the parties agreed to collective arbitration. Thus, as in *Stolt-Nielsen*, the Arbitrator did not "identify any agreement authorizing class proceedings" and "misapprehended the parties' intent" *Id.* at 569, 571-72 (internal citation omitted). As a matter of law, therefore, the Arbitrator cannot be deemed to have "even arguably[] interpreted the parties' contract." *Id.* at 569. As such, this case and *Oxford Health* "fall on opposite sides of the line that § 10(a)(4) draws to delimit judicial review of arbitrable decisions." *Id.* at 572.

In sum, the Arbitrator abandoned his interpretative role and reached a decision based on his own preference for collective arbitration. Because he exceeded his contractual mandate and acted contrary to the Arbitration Agreement's express terms, this Court must vacate his Class Determination Award.

VI.    **CONCLUSION**

For the reasons explained above, this Court must issue an order vacating the Arbitrator's

Class Determination Award and requiring Mr. Torgerson to pursue his FLSA claim in arbitration

on an individual basis.

Respectfully submitted,

*/s Robert H. Bernstein*
Robert H. Bernstein
Shareholder
GREENBERG TRAURIG, LLP
500 Campus Drive
Florham Park, NJ 07932-0677
Tel: 973-360-7946
Fax: 973-295-1362
bernsteinrob@gtlaw.com

James N. Boudreau
Adam R. Roseman
(*admitted pro hac vice*)
GREENBERG TRAURIG, LLP
1717 Arch Street, Suite 400
Philadelphia, PA 19103
Tel: 215-988-7833/7826
Fax: 215-717-5209
boudreauj@gtlaw.com
rosemana@gtlaw.com

Dated: August 7, 2019

*Attorneys for LCC International, Inc. n/k/a Tech Mahindra Network Services International, Inc.*